JOHN L. WOODS, GEORGE M. PACK, MARK CARRINGTON, GREENE PACK AND EDWIN F. HOLMES v. FREDERICK S. AYRES, EBENEZER R. AYRES AND JAMES S. AYRES.

*Assumpsit—Implied contracts—Constructive or quasi contracts— Set-off—Comp. L., ch. 43.*

Where it is understood between the parties to a transfer of partnership interests that rights of action are transferred, and they act accordingly without objection, a third party can hardly dispute the completeness of the assignment where there is no evidence of hostile title.

The right of set-off is purely statutory.

Assumpsit does not necessarily imply a contract but may lie where some duty would justify the court in imputing a promise to perform it.

Assumpsit, under Michigan statutes, may lie on judgments and sealed instruments (Comp. L., § 6194); for penalties and forfeitures (id., § 6841), and at the suit of highway commissioners for money laid out on bridges required to be maintained by private parties.

A claim for log-driving under Act 221 of 1863, though it supports an assumpsit, is not based on implied contract.

Express and implied contracts do not differ in nature but in the mode of substantiation, and neither can arise unless the parties sustain contract relations and are in "privity" with each other.

The privity essential to a contract must proceed from the will of the parties, though there may be privity by operation of law where there is no privity of contract.

Contract relations require that the parties be consenting bargainers personally or by delegation, and must be manifested by some intelligible conduct, act or sign.

No implied contract or promise rises from a spontaneous service done as an act of kindness and without being asked, or where it is accounted for on more likely grounds than a promise of payment.

Logs were sold to be taken in the stream, but the vendor insisted that the purchasers gather them in their boom for scaling and the latter assented. *Held* that the purchasers could not, on so doing, claim a set-off as for services rendered.

Error to Huron. Submitted June 21. Decided Oct. 15.

39 MICH.—44.

ASSUMPSIT. Defendants bring error.

*Winsor & Snover* and *Levi L. Wixson* for plaintiffs in error. Assumpsit lies for breaking log-jams under Comp. L., ch. 43; *Chapman v. Keystone L. & S. Mfg. Co.*, 20 Mich., 358; any claim for services if within Comp. L., § 5796, and if it can be the subject of suit, may be set off, *Wallace v. Finnegan*, 14 Mich., 170; *Roethke v. Brewing Co.*, 33 Mich., 340; any demand owned before assignment or notice of assignment by those against whom it lies, may be used as set-off, Comp. L., §§ 5775, 5796; *Smith v. Warner*, 16 Mich., 390; *Finn v. Corbitt*, 36 Mich., 318; the jury must determine what is covered by a parol contract, *Jenness v. Shaw*, 35 Mich., 20.

*Atkinson & Atkinson* for defendants in error.

GRAVES, J. In the fall of 1871 a claim in favor of the firm of Ayres, Learned & Wiswall arose against plaintiffs in error for four dollars per thousand feet upon a quantity of pine saw logs delivered by the firm to plaintiffs in error under an agreement for their delivery subject to that drawback, to replace others the firm had cut on lands of the plaintiffs in error. The members of the firm in whose favor the claim arose were Ebenezer Wiswall, Charles G. Learned and defendant in error Frederick S. Ayres. November 6, 1871, this firm was succeeded by that of "Ayres, Learned & Co.," composed of Frederick S. Ayres, Jonas R. Learned and James S. Ayres, and this again on the 24th of October, 1874, by the firm of "Ayres & Co.," composed of defendants in error. In 1877 these parties assuming to own the claim in question brought this action upon it and recovered. The other parties brought error.

*First.* We think the objection that there was no evidence of the passage of the interest of Charles G. Learned to defendants in error is untenable. The conduct of the parties and the surrounding circumstances import that

they supposed his right in the personalty including things in action was made over, and they likewise import that they actually applied the acts of conveyance on that basis. If their minds concurred in designing such a transfer, and they were satisfied it was consummated and have remained content, there is small chance for the plaintiffs in error to contest it. There is no evidence that Charles G. Learned does not acquiesce, or any evidence of an outstanding hostile title.

The tenor of the instrument dated October 20, 1874, in which Charles G. and Jonas R. Learned joined is not only consistent with the practical construction, but is very indicative of the same sense. The face of it shows that the expression "personal property" in the clause of conveyance was used in a form designed to include "credits" or rights of action, and therefore to embrace the interest in this item.

Notwithstanding the repeated shifts of ownership of individual interests in the personal assets, the purpose seems to have been unvaried that all the interests in any item should be vested and kept in whatever firm occupied the place of the original concern, and the firm of "Ayres, Learned & Co." and of "Ayres & Co." seem to have come successively into that position. Whilst, then, the record contains evidence of the passage of Charles G. Learned's interest and of its vesting in defendants in error, there is none of a contrary bearing.

*Second.* Plaintiffs in error offered to show by way of set-off a demand in their favor for moving certain logs of "Ayres, Learned & Wiswall" in the Pinnepog river in the season of 1871 pursuant to the act of 1861 as amended in 1863 to regulate the "floating of logs and timbers in the streams of this State" (Sess. L. 1863, p. 374): and a further demand in their favor for moving logs of "Ayres, Learned & Co." in the same river in the season of 1872 and pursuant to the same law. Upon objection by defendants in error the court ruled against the offer.

Assuming that all the conditions were present to generate a liability under this statute, were the demands enforceable under the set-off law? If they were not, the ruling was correct. In order to decide upon this it is necessary to consider of what nature the demand is on which this statute impresses the right of enforcement, and whether the statute of set-off fairly comprehends it.

The right of set-off at law is given and limited by statute. The common law never recognized it. Bac. Ab., tit. "Set-off." The provisions concerning set-off must therefore be consulted to see in what cases and in what circumstances the right is admitted. Unless a case is positively embraced by the specifications enacted by the Legislature, the remedy is absolutely denied and the claim will remain to be separately enforced as though there were no such statute.

Now the first pre-requisite under the law allowing set-off is that the demand has arisen "upon judgment, or upon contract express or implied" (Comp. L., § 5796, subd. 1), and unless it has originated in one of these ways it is incapable of being set off. The demands in question did not arise on judgment or upon express contract. So much may be taken for granted. If then, they were capable of being set off, it must be because they arose on implied contract. Did they originate in that way? The question is not whether they constituted assumpsits in some metaphorical or artificial sense,—whether under the license allowed in modern times in applying forms of action they might not be sued in assumpsit,—but it is whether in the sense of the statute of set-off they were causes of action on true implied contract.

In early times the want of a common law remedy suited to cases of non-performance of simple promises caused frequent recourse to equity for relief: but at length in the 21st of Henry VII it was settled by the judges that an action on the case would lie as well for

non-feasance as for malfeasance, and in that way assumpsit was introduced. In theory it was an action to recover for non-performance of simple contracts and the formula and proceedings were constructed and carried on accordingly. Very early there were successful efforts to apply it beyond its import, and from the reign of Elizabeth "this action has been extended"—as Mr. Spence informs us—"'conscience encroaching on the common law'—to almost every case where an obligation arises from natural reason, and the just construction of law, that is, *quasi ex contractu;*" and is now maintained in many cases which its principles do not comprehend and where fictions and intendments are resorted to, to fit the actual cause of action to the theory of the remedy. It is thus sanctioned where there has been no actual assumpsit—no real contract—but where some duty is deemed sufficient to justify the court in imputing a promise to perform it and hence in bending the transaction to the form of action. 1 Spence Eq. Jur., 243, 244, 245; *Hosmer v. Wilson,* 7 Mich., 294; *Ward v. Warner,* 8 id., 508; *Watson v. Stever,* 25 id., 386, and other cases in this court.

This tendency to apply assumpsit to causes of action foreign to its original spirit and design is apparent in our legislation. The statute allows it to be brought on judgments and sealed instruments (Comp. L., § 6194), also for penalties and forfeitures (§ 6841), and by commissioners of highways for expenses laid out on bridges required to be maintained by private parties (§ 1311). There are other instances in the laws.

The arbitrary use which has been made of the action has caused many incongruities and no little confusion. The practice of strained constructions and the invention of fictions and intendments to subject causes of action to the remedy which were foreign to it, has led somewhat to a confounding of transactions which are not contracts with those which are and to a neglect of obvious and necessary distinctions. But it may be observed

in passing that it is not the only occasion where inaccuracies have been generated by a too close adherence to the plan of studying causes of action through the forms of action. The circumstance that a cause of action in point of fact not *ex contractu* is allowed to be sued in assumpsit and to be described as matter of contract and to be loosely spoken of as implied contract is of no more force to fix its actual character contrary to the truth than is the allegation of loss and finding in trover to convey the sense of a literal loss and finding. Permission to apply the action to a transaction not involving any real contract relation between the parties cannot change the true nature of the transaction and transform it into matter of contract. Courts cannot make contracts for parties. And the fictions and intendments permitted for the sake of the remedy are explainable whenever necessary.

It seems scarcely necessary to add that the determination by a majority of the court (*Chapman v. Keystone &c. Co.*, 20 Mich., 358) that the party moving logs as contemplated by the first section of the act of 1861 as amended in 1863, acquires a distinct right of action against the log owners *enforcible in assumpsit*, is of no force whatever to show that such a demand arises on implied contract.

Neither an express contract nor one by implication can come into existence unless the parties sustain contract relations, and the difference between the two forms consists in the mode of substantiation and not in the nature of the thing itself. *Marzetti v. Williams*, 1 B. & Ad., 415; *Beirne v. Dord*, 1 Seld., 95. To constitute either the one or the other the parties must occupy towards each other a contract status and there must be that connection, mutuality of will and interaction of parties, generally expressed though not very clearly by the term "privity." Without this a contract by implication is quite impossible. Broom's Com. on Com. L., 317; Broom's Phil. of Law, 18, 23, 24, 25, 29, 34; 1 Austin's

Juris., 325, 326; 2 id., 946, 948, 1018. Cases in illustration are numerous. *Blandy v. DeBurgh*, 6 C. B., 634.

Where there is a spontaneous service as an act of kindness and no request, or where the circumstances account for the transaction on some ground *more probable* than that of a promise of recompense, no promise will be implied. The contract connection is not established. *Bartholomew v. Jackson*, 20 Johns., 28; *James v. O'Driscoll*, 2 Bay, 101; *St. Jude's Church v. Van Denberg*, 31 Mich., 287; *Livingston v. Ackeston*, 5 Cow., 531; *Nicholson v. Chapman*, 2 H. Black., 254; *Smart v. Guardians of the Poor*, 36 E. L. & E., 496; *Otis v. Jones*, 21 Wend., 394, 396; *Ehle v. Judson*, 24 Wend., 97; *Ingraham v. Gilbert*, 20 Barb., 151; *Eastwood v. Kenyon*, 11 Ad. and El., 438; *Hertzog v. Hertzog*, 29 Penn. St. 465; *Lange v. Kaiser*, 34 Mich., 317.

The parties must be consenting bargainers personally or by delegation, and their coming together in contract relation must be manifested by some intelligible conduct, act or sign. If not, no contract is shown. *Depperman v. Hubbersty*, 33 E. L. & E., 88; *Gerhard v. Bates*, 20 E. L. & E., 129; *Williams v. Everett*, 14 East, 582, 597, 598; *Exchange Bank of St. Louis v. Rice*, 107 Mass., 37; *Mellen v. Whipple*, 1 Gray, 317; *Pipp v. Reynolds*, 20 Mich., 88; *Turner v. McCarty*, 22 Mich., 265; *Ashley v. Dixon*, 48 N. Y., 430; *Merrill v. Green*, 55 N. Y., 270; *Simson v. Brown*, 68 N. Y., 355; *Strong v. Phœnix Ins. Co.*, 62 Mo., 289; *Bank of Republic v. Millard*, 10 Wall., 152; *First National Bank of Washington v. Whitman*, 94 U. S., 343; *Starke v. Cheeseman*, 1 Ld. Raym., 538; *Keller v. Holderman*, 11 Mich., 248; *Van Valkenburg v. Rogers*, 18 Mich., 180; *Cundy v. Lindsay*, 38 L. T. Rep. (N. S.), 573; *Hills v. Snell*, 104 Mass., 173, 177; *Boston Ice Co. v. Potter*, 123 Mass., 28; *Sullivan v. Portland &c. R. R. Co.*, 94 U. S., 806. The privity essential to a contract must proceed from the will of the parties. There may be a privity by operation of law where no privity of contract exists. 4 Bouvier's Inst., No. 4237.

Before leaving this part of the discussion it will be useful to quote somewhat liberally from the instructive opinion of Mr. Justice Lowrie, in *Hertzog v. Hertzog supra.* After a citation from 2 Blackstone's Comm., 443, the opinion proceeds:

"There is some looseness of thought in supposing that reason and justice ever dictate any contracts between parties, or impose such upon them. All true contracts grow out of the intentions of the parties to transactions, and are dictated only by their mutual and accordant wills. When this intention is expressed, we call the contract an express one. When it is not expressed, it may be inferred, implied, or presumed, from circumstances as really existing, and then the contract, thus ascertained, is called an implied one. The instances given by Blackstone are an illustration of this. But it appears in another place, 3 Comm., 159–166, that Blackstone introduces this thought about reason and justice dictating contracts, in order to embrace, under his definition of an implied contract, another large class of relations, which involve no intention to contract at all, though they may be treated as if they did. Thus, whenever, not our variant notions of reason and justice, but the common sense and common justice of the country, and therefore the common law or statute law, impose upon any one a duty, irrespective of contract, and allow it to be enforced by a contract remedy, he calls this a case of implied contract. Thus out of torts grows the duty of compensation, and in many cases the tort may be waived, and the action brought in *assumpsit.*

"It is quite apparent, therefore, that radically different relations are classified under the same term, and this must often give rise to indistinctness of thought. And this was not at all necessary; for we have another well authorized technical term exactly adapted to the office of making the true distinction.

"The latter class are merely *constructive* contracts, whilst the former are truly implied ones. In one case

.the contract is mere fiction, a form imposed in order to adapt the case to a given remedy; in the other it is a fact legitimately inferred. In one, the intention is disregarded; in the other, it is ascertained and enforced. In one, the duty defines the contract; in the other, the contract defines the duty. We have, therefore, in law three classes of relations called contracts.

"*First*. Constructive contracts, which are fictions of law adapted to enforce legal duties by actions of contract, where no proper contract exists, express or implied.

"*Second*. Implied contracts, which arise under circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intention to contract.

"*Third*. Express contracts, already sufficiently distinguished."

Further on it is also observed that "every induction, inference, implication, or presumption in reasoning of any kind, is a logical conclusion derived from, and demanded by, certain data or ascertained circumstances. If such circumstances demand the conclusion of a contract to account for them, a contract is proved; if not, not."

We may now turn to the statute under which the liability sought to be set off arose and on which it depends. It is part of the first section of the act and provides "that if any person or persons shall put, or cause to be put, into any navigable river, creek or stream of this State, any logs, timber or lumber, for the purpose of floating the same to the place of manufacture or market, and shall not make adequate provisions, and put on sufficient force for breaking jams of such logs, timber or lumber, in or upon such river, creek or stream, or for running or driving the same, or clearing the banks of such river, creek or stream of the same, and shall thereby obstruct the floating or navigation of such river, creek or stream, it shall be lawful for any other person, com-

pany or corporation, floating or running logs, timber or lumber in such river, creek or stream so obstructed, to cause such jams to be broken, and such logs, timber or lumber to be run, driven and cleared from the banks of such river, creek or stream, at the cost and expense of the person or persons owning such logs, timber or lumber, and such owner shall be liable to such person, company or corporation for such cost and expense." Laws of 1863, p. 374.

Now the liability or cause of action here ordained and described is not to arise on contract,—is not to spring from any compact or privity of agreement or any coming together of the parties under any contract relation, or on the footing or in any view of any agreement. The owner of the logs is to become liable without any regard to his will or his assent to the acts and things for which he must pay. His accession to the transaction is not contemplated. He is to become debtor to a party with whom he has never had any contract relation whatever. The statute simply imposes the duty to pay for services which, without the provision, would, as being services purely voluntary, be not recoverable in any way or form.

No case is presented to raise an inference or cause an implication that there was a contract. The demand arises upon statute, that is, upon a duty which the statute originates, and has no place in the law of contracts. The liability belongs to that class Mr. Justice Lowrie calls "constructive contracts," and which the civilians denominate "*quasi* contracts," meaning transactions in which the parties make no agreement whatever, but on which the law grounds specific obligations. Poth. on Obligations, Pt. I., ch. 1, sec. 2.

If the demand set up in this case should be considered as arising on contract within the meaning of the set-off law it will be very difficult to draw the line.

The conclusion on this part of the case is that they did not so arise and hence were not lawful matters of

set-off. In regard to set-off the right is tied down by the statute to demands arising on contract, but assumpsit is not so confined but is allowed an expansive application to cases which do not arise on contract.

*Third.* The judge was asked to direct the jury that "if the defendants performed labor at the request of Ayres, Learned and Wiswall in carrying out the latter's part of the contract, the defendants should be allowed pay for such expenditure." This was refused, and the jury were told that no set-off could be allowed for booming the logs by defendants; that whatever was done was part of the agreed process of receiving the logs.

It is objected, *first*, that it was part of the contract that Ayres, Learned & Wiswall should get the logs ready for scaling, and that the judge erred in excluding the claim of set-off for services rendered at the request of Ayres, Learned & Wiswall in booming the logs to get them ready; and *second*, that the contract was verbal and the decision as to what it contained for the jury, and that the judge erred in ruling that the booming was for plaintiffs in error.

These positions are not quite consistent. However we perceive no ground on which the plaintiffs in error can reasonably complain. The intrinsic character of the request as well as the real case justified its refusal. Besides being vague it virtually assumed that it was part of the contract that Ayres, Learned & Wiswall were to do certain things, and that there was evidence tending to show that these things were in fact performed by plaintiffs in error at the request of Ayres, Learned & Wiswall.

The logs were to be taken by plaintiffs in error where they were in the river and Ayres, Learned & Wiswall were not to handle them further. On that subject there was no chance for dispute. All the evidence agreed upon it. Plaintiffs in error proposed that they should be scaled in the river; but Ayres insisted, and no doubt

on the ground of convenience, that plaintiffs in error should gather them in their boom for scaling, instead of leaving them to be sought after along the river to be scaled; and this was distinctly assented to. Their collection in the boom to be scaled was therefore not a service on which to ground a right of set-off.

*Fourth.* It is objected that whilst the defendants in error admitted that the plaintiffs in error were entitled by the contract to 140,000 feet, still the charge left it to the jury to decide whether in getting 130,000 feet the plaintiffs in error did not get all they were entitled to under the contract.

The charge was not as pointed on this subject as it might have been, but plaintiffs in error have not been hurt as we think, and have no just ground of complaint. The judge did not specify to the jury that one of the defendants in error in giving his evidence before them testified that by the contract the plaintiffs in error were entitled to 140,185 feet. But he did speak of the three different amounts testified about, namely, 130,000 feet, 140,000 feet and 182,000 feet, and told the jury that if plaintiffs in error were to receive 140,000 feet, then 10,000 feet at the price found to be the true one, less $4.00 per thousand feet, should be deducted from the plaintiff's claim. There is no fair ground for saying the jury were misled. But we observe that plaintiffs in error submitted several requests to charge and yet preferred none on this subject, and moreover that they do not appear to have taken any exception suggestive of this objection, if indeed any at all competent to reach any part of the body of the charge.

All the objections insisted on have been considered, and no error being shown of which the plaintiffs in error can complain, the judgment should be affirmed with costs.

The other Justices concurred.