the trustees, and that they have power and authority to receive the trust fund and to give receipts. Power of sale and reinvestment relieves the purchaser of any burden of looking after the application of the money.''

''When the object of the trust is defined, but the purchase money is to be reinvested upon trusts requiring time and discretion, the purchaser is not bound to see to the application thereof.'' 78 Va., 313.

''Where trustees under a will have power to sell, in their discretion, and re-invest the proceeds on the same trusts, a purchaser from them is not bound to see to the application of the purchase money.'' 58 Md., 53.

It is apparent from the above authorities that a purchaser of real estate devised by defendant's testatrix to this church is not required to see to the application of the purchase money.

With reference to the quieting of the title to said real estate, the court being satisfied that the same should be done, it is accordingly ordered.

Let an entry be drawn in conformity to these findings of the court.

---

### ATTACHMENT FOR MONEY LOST IN A BUCKET SHOP.

Superior Court of Cincinnati.

EVERET R. BAKER v. MOREHEAD & CO.

Decided, October 1, 1908.

*Attachment—In Action for Money Lost in Scheme of Chance—Constructive Contracts—Pleading—Sections 5521, 4269 and 4272.*

An order for attachment without bond will lie against a defendant for eign corporation in an action for the recovery of money lost in a scheme of chance, commonly called a bucket shop.

*Ernst & Cassatt*, for the motion.
*Peck, Shaffer & Peck*, contra.

SPIEGEL, J.

Plaintiff alleges that the defendant is a corporation under the laws of Ohio, maintaining a scheme of chance, commonly called

a bucket shop; that between the 23d day of February, 1907, and the 10th day of September, 1907, he lost, expended and paid to the said defendant on account of said game of chance $13,100, which sum the defendant received to the use of said plaintiff, and in which sum, together with exemplary damages in the sum of $500, defendant is indebted to him.

Upon this petition, plaintiff obtained an order of attachment against the defendant without giving bond, and the case is now before me on a motion to discharge and set aside the order of attachment because no bond was given.

Section 5521 of the Revised Statutes provides that plaintiff may have an attachment when a defendant is a foreign corporation, and plaintiff's claim arises upon a contract, judgment or decree; or for causing death or a personal injury by a negligent or wrongful act, and Section 5523 provides that when a defendant is a foreign corporation no undertaking need be given.

It is admitted that defendant is a foreign corporation, and that plaintiff's claim does not arise upon judgment or decree or from causing death or a personal injury. Does his claim then arise upon contract?

This action is brought under the provisions of Section 4269, *et seq.*, which provide that all promises, agreements, notes or other contracts when the whole or any part of the consideration of such promise, etc., is for money or other valuable thing whatsoever, won or lost upon any game of any kind, shall be absolutely void and of no effect; but any person who loses to another person any sum of money or thing of value in playing at any game or scheme of chance, or any citizen for him, may sue for and recover the same by civil action founded on this chapter, in which action it shall be sufficient for the plaintiff to allege that the defendant is indebted to the plaintiff in the sum so lost and paid.

Contracts are divided into three classes—express, implied and quasi or constructive. Only the first two fall under the class of true contracts, namely, an agreement or promise enforceable by law, as defined by Pollock. The third category applies to a class of obligations which are imposed or created by law without regard to the assent of the party bound, on the ground that they

are dictated by public policy, and which are allowed to be en-forced by an action *ex contractu*. These obligations, however, are not contract obligations at all in the true sense, for there is no agreement; but they are clothed with the semblance of con-tract for the purpose of the remedy. They are therefore called quasi or constructive contracts.

Possibly nowhere have these constructive contracts been better explained than by Judge Lowrie, of the Pennsylvania State Supreme Court, in *Herzog* v. *Herzog*, 29 Penn., 467. Quoting Blackstone, who knew but two classes of contracts, express and implied, he says:

"This is the language of Blackstone, 2 Comm., 443, and it is open to some criticism. There is some looseness of thought in supposing that reason and justice ever dictate any contracts be-tween parties, or impose such upon them. All true contracts grow out of the intentions of the parties to transactions and are dictated only by their mutual and accordant wills. When this intention is expressed we call the contract an express one. When it is not expressed it may be inferred, implied or presumed from circumstances as really existing, and then the contract thus ascertained is called an implied one. The instances given by Blackstone are an illustration of this. But it appears in an-other place, 3 Comm., 159-166, that Blackstone introduces this thought about reason and justice dictating contracts, in order to embrace under his definition of an implied contract, another large class of relations, which involve no intention to contract at all, though they may be treated as if they did. Thus, when-ever, not under our varient notions of reason and justice, but the common sense and common justice of the country, and there-fore the common law or statute law, impose upon any one a duty, irrespective of contract, and allow it to be enforced by a contract remedy, he calls this a case of implied contract. Thus out of torts grows the duty of compensation, and in many cases the tort may be waived, and an action brought in assumpsit. It is quite apparent, therefore, that radically different relations are classi-fied under the same term, and this must often give rise to in-distinctness of thought. And this was not at all necessary; for we have another well authorized technical term exactly adapted to the office of making the true distinction. The latter class are merely constructive contracts, while the former are truly im-plied ones. In one case, the contract is mere fiction, a form im-posed in order to adapt the case to a given remedy; in the other,

it is a fact legitimately inferred. In one the intention is disregarded; in the other it is ascertained and enforced. In one, the duty defines the contract; in the other, the contract defines the duty. We have, therefore, in law three classes of relations called contracts: 1. Constructive contracts, which are fictions of law adapted to enforce legal duties by actions of contract, where no proper contract exists, express or implied. 2. Implied contracts, which arise under circumstances, which, according to the ordinary course of dealing and the common understanding of men, show a mutual intention to contract. 3. Express contracts, already sufficiently distinguished.''

Also, Judge Graves, of the Michigan Supreme Court, who explains it historically in *Woods* v. *Ayers*, 39 Mich., 348:

''In early times, the want of a common law remedy suited to cases of non-performance of simple promises caused frequent recourse to equity for relief; but at length in the 21st of Henry VII it was settled by the judges that an action on the case would lie as well for nonfeasance as for malfeasance, and in that way assumpsit was introduced. In theory, it was an action to recover for non-performance of simple contracts, and the formula and proceedings were constructed and carried on accordingly. Very early, there were successful efforts to apply it beyond its import, and from the reign of Elizabeth 'this action has been extended' —as Mr. Spence informs us—'conscience encroaching on common law' to almost every case where an obligation arises from natural reason, and the just construction of law, that is *quasi ex contractu*, and is now maintained in many cases which its principles do not comprehend and where fictions and intendments are resorted to, to fit the actual cause of action to the theory of the remedy. It is thus sanctioned where there has been no actual assumpsit, no real contract, but where some duty is deemed sufficient to justify the court in imputing a promise to perform it, and hence in bending the transaction to the form of action. This tendency to apply *assumpsit* to causes of action foreign to its original spirit and design is apparent in our legislation. The statute allows it to be brought on judgments and sealed instruments, also for penalties and forfeitures.''

Coming now to the case at bar, it distinctly falls within the definition of a constructive contract. It makes gaming contracts unlawful and authorizes the loser to sue *ex contractu*. Section 4272 provides as follows:

"In the prosecution of such actions it shall be sufficient for the plaintiff to allege that the defendant is indebted to the plaintiff or received to the plaintiff's use the money so lost and paid, or converted the goods won of plaintiff to the defendant's use, whereby the plaintiff's action accrued to him."

In *Meech* vs *Stoner*, 19 N. Y., page 30, the Court of Appeals says:

"The principles involved in this question have been several times considered in the courts of England, and the question itself there determined. The statute of Anne (ch. 14) gave to the person losing at play an action of debt, at any time within three months against the winner; and in the case of *Turner* v. *Warren* (2 Strange, 1079), the question was whether in an action founded on that statute, the defendant could be held to special bail, the defendant's counsel comparing it to penal actions where no bail was ever required. But the court held there ought to be special bail in the case, because the defendant was a debtor of the plaintiff. The clause of the statute was considered as remedial and not penal. In *Bones* v. *Booth* (2 Wm. Blackstone, 1226), the plaintiff sued to recover back seventeen guineas lost at play. The jury having found a verdict for the defendant, a motion for a new trial was made, for the reason that the verdict was against the evidence. This was resisted on the ground that there was no precedent for a new trial in a penal action. But the court said that the statute was not penal but remedial; and Sir William Blackstone observed 'The statute makes the winning of £10 at any one time or sitting, a nullity, and therefore gives the loser an action to recover back what still properly continues to be his own money.' "

In Barbour's Supreme Court Reports (N. Y.), Vol. 48, page 370, the Court of Appeals says:

"The winner of money by betting or gaming has so much belonging to the loser. The winner can not defend himself against the claim of the loser by virtue of the gaming or betting contract under which he acquired the money, because the statute says the contract is void. The winner has so much money of the loser to which he has no title. The winner is in the condition of one who has found a sum of money belonging to another. There is an implied contract to pay it to the loser. So when money has been obtained by fraud or violence, the injured party may waive the wrong, and sue as upon a promise, the law implying a

promise from the moral obligation. The injured party has a choice of forms of action. The statute against betting and gaming demands a liberal construction. They are remedial, not penal."

In our Superior Court, in the case of *Kleimeyer* v. *John A. Payne et al*, Ohio Law Rep., Vol. 3, page 19, a case of money lost on betting on races, Judge Hoffheimer held:

"Were the petition in this action founded on this section the authorities cited by defendant, Payne, in support of his demurrer, would be applicable, but Section 1956 (Ky. Stat.) is remedial in its nature; its purpose is not to punish the winner but to give to the loser the right to recover that which it is presumed was wrongfully taken from him. Its provisions are liberally construed (American & English Encylopedia, 2d Ed., Vol. 14, p. 625). The right to recover under this section is founded in contract. The law declares that the defendant had no right to receive the amount in question. Having no right to receive it, it is bound to return it to the owner, the person from whom he won it. In other words, the law imputes an implied contract that the money should be restored by the person who unlawfully obtained it."

The motion to dismiss the attachment must, therefore, be overruled.